IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

LYTLE V. LYTLE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STACY M. LYTLE, APPELLANT,

V.

ANTHONY D. LYTLE, APPELLEE.

Filed January 2, 2018.    No. A-17-344.

Appeal from the District Court for Saline County: RICKY A. SCHREINER, Judge. Affirmed.

Sean M. Reagan, of Reagan, Melton & Delaney, L.L.P., for appellant.

Matthew Hanson, of Hanson, Hroch & Kuntz, for appellee.

MOORE, Chief Judge, and INBODY and BISHOP, Judges.

BISHOP, Judge.

Stacy M. Lytle filed a complaint to modify a 2012 decree dissolving her marriage to Anthony D. Lytle. Following trial in the district court for Saline County, Stacy was not granted the relief she requested with regard to custody and parenting time of the parties' son, and instead, the court's modification order expanded Anthony's parenting time. Stacy appeals the district court's order; we affirm.

BACKGROUND

When Stacy and Anthony divorced in October 2012, they agreed to and were awarded joint legal and physical custody of their son, Carter (born in March 2008). Carter was to be with Anthony from Monday at 5 p.m. until Thursday at 7:30 p.m., and then with Stacy at all other times. The parties also had an alternating holiday schedule. Both parties were living in Wilbur, Nebraska. Stacy's income was higher than Anthony's, and with adjustments made for Anthony providing Carter's health insurance coverage, Stacy was ordered to pay child support of $155 per month.

- 1 -

Stacy filed a modification action on January 11, 2016. She and Anthony were both living in Wilbur. Stacy claimed a material change in circumstances had occurred in that the parties had been "operating under a 10-4 schedule for at least the past two years, with the child residing primarily with [Stacy] and having time with [Anthony] each Tuesday overnight and every other weekend." She alleged it would be in Carter's best interests for the court to modify the decree "to recognize the status quo" and award Stacy physical custody. Stacy pled that "joint legal custody may remain placed with both parties," however, her prayer requested "temporary and permanent physical and legal care, custody and control of Carter." She further requested an order establishing support in accordance with the Nebraska Child Support Guidelines.

Anthony filed a "Responsive Pleading and Counter-Complaint to Plaintiff's Complaint for Modification of Decree of Dissolution." He asked for the decree to be modified to grant him sole physical custody of Carter. His alleged material change in circumstances consisted of the parenting plan having been orally modified by the parties to accommodate their schedules, and further, Anthony was able to have "greater physical time" with Carter.

Trial took place on December 16, 2016, and January 11, 2017. Carter was 8 years old and in third grade at the time. The district court entered an "Order Modifying Decree" on March 10. It found there had been a material change in circumstances since the entry of the decree affecting Carter's best interests "in that communication between the parties has broken down and they are unable to jointly agree upon parenting time as contemplated in the Decree." The court found, however, that the evidence was not sufficient to warrant a change in physical custody; but, it was sufficient to modify the parenting time of the parties. The court-ordered parenting plan provides for alternating weekly parenting time, with the exchange time occurring each Friday at 5 p.m. An alternating holiday schedule was also ordered, along with a number of miscellaneous provisions.

The court also concluded it was in Carter's best interests for the parties to maintain joint legal custody. The order further states:

> The Court finds that the parties are unable to communicate effectively with each other, and that the parties should use the "Talking Parents" web app found at https://www.talkingparents.com as a way to communicate so they can both remain active in parenting their child effectively while at the same time limiting their contact and the potential for conflict. The parties should make every effort to communicate in a manner that is respectful of the other party. Neither parent should disparage or in any way denigrate the other parent in any activity or communication involving the child and neither parent should inquire of the other's personal affairs through the child.

The court also found that Stacy should continue to pay child support, but that it should be $63 per month beginning April 1, 2017. The amount came from a calculation proposed by Anthony, which the court found to accurately reflect the incomes of the parties. Stacy timely appealed the modification order.

ASSIGNMENTS OF ERROR

Stacy assigns, reordered and restated, the district court erred by: (1) failing to find the parenting schedule the parties had been following constituted a material change in circumstances

warranting modification and was in Carter's best interests; (2) modifying the parenting plan to an alternating weekly schedule; and (3) ordering the child support proposed by Anthony.

STANDARD OF REVIEW

Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). Parenting time determinations are also matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Aguilar v. Schulte*, 22 Neb. App. 80, 848 N.W.2d 644 (2014).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Schrag v. Spear, supra.* A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id.*

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

ANALYSIS

*Failure to Modify Physical Custody.*

Stacy claims the district court erred when it declined to modify the decree to award physical custody of Carter solely to her.

The legal principles governing modification of child custody are well settled. *State on behalf of Jakai C. v. Tiffany M.*, 292 Neb. 68, 871 N.W.2d 230 (2015). First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. *Id*. Next, the party seeking modification must prove that changing the child's custody is in the child's best interests. *Id*. A material change in circumstances means the occurrence of something which, had it been known at the time of the initial decree, would have persuaded the court to decree differently. *Id*. The party seeking modification of child custody bears the burden of showing as an initial matter that there has been a change in circumstances. *Id*.

In its March 10, 2017, modification order, the district court found there had been a material change in circumstances since the entry of the decree affecting Carter's best interests "in that communication between the parties has broken down and they are unable to jointly agree upon parenting time as contemplated in the Decree." The court found, however, that the evidence was not sufficient to warrant a change in physical custody; but, it was sufficient to modify the parenting time of the parties. Stacy argues the evidence did support a change in physical custody, and did not support the parenting time modification made by the court. We begin by addressing her argument that physical custody should have been modified and awarded solely to her.

Stacy contends "the routine to which Carter has become accustomed is in his best interests." Brief for appellant at 13. Stacy claims Carter's home and schoolwork routine when with

her is "excellent," whereas, when Carter is with Anthony, "those results are hit-or-miss." *Id*. Stacy's argument rests largely on the fact that the parties had been following a 10/4 parenting schedule since February 2014, and that Carter "has excelled under it"; therefore, it is in Carter's best interests to maintain it. *Id*. at 14. To address her claim, we recount evidence from the record pertinent to this issue, as well as to provide some context.

Stacy is a registered nurse and works at a rehabilitation facility in Lincoln, Nebraska. Stacy leaves for work by 7:15 a.m.; Carter leaves for the bus stop at 7:30 a.m. Stacy has had this work schedule for about 3 years. "This is the first year in which [Carter's] been home alone before school and home alone after school." Carter gets home from school about 4 p.m., and Stacy gets home around 4:30 or 5 p.m. After the divorce, Stacy lived on an acreage in Crete until August 2014. She lived there with "a significant other" who had 5 children. Stacy has had "[s]everal relationships" since then, with Carter being involved with a few, although Stacy said she waited several months before introducing anyone to Carter. There were four such individuals since the divorce.

Anthony is a deputy sheriff with the Saline County Sheriff's Office, and has been employed there for 17 years. Anthony remarried in October 2013. He and his family live about 5 blocks from Stacy. Anthony's work schedule at the time of trial was Monday through Friday, "normally eight to four." Anthony testified he has a stepson, age 10, and a stepdaughter, age 8. He and his wife also have a 2-year-old daughter. Anthony's stepdaughter is in the same grade and attends the same school as Carter, but they are in separate classrooms. Stacy has no problem with Carter spending time with these children.

Stacy testified that after the entry of the divorce decree, she and Anthony followed the "three days with dad, four days with mom" schedule. However, in February 2014, they moved away from that schedule. Carter was in kindergarten at the time. Anthony was seeking a new schedule because at the time of the divorce, he was working "Friday, Saturday, Sunday and Mondays, day shift," and had Tuesday, Wednesday, and Thursday off. Anthony's shift subsequently changed to working the day shift throughout the week, with the weekends off. He contacted Stacy "many times" to talk about changing the parenting schedule. It was after he remarried (October 2013) that he went to weekends off at work. Anthony recalled going to Stacy's house a couple times to figure things out, and they met at a restaurant one night, and he took proposals, "and that's how it started."

Anthony's proposals sought more extensive parenting time, but Stacy did not want to do what Anthony wanted. Anthony said, "She was adamant that it was her way. She was limited on the times that she would be willing to let me have Carter." As a result, they went to a schedule with Anthony having Carter every Tuesday night through Wednesday and every other weekend. Anthony was not satisfied with that, but "it was better than what I had been [getting] for a long time, and I was tired of missing out on weekends with him." Anthony claimed he had been asking for more parenting time "ever since then." Anthony said he continually told Stacy he wanted to "go a week at a time so we can share equal time with him," but "she has adamantly said she will never do that." According to Anthony, Stacy's response was that "Carter is doing good in school," and "she is not going to interrupt what he has going on."

Stacy testified she did not believe a change to alternating weekly parenting time would be in Carter's best interests because "he is doing well now. He is thriving." She said, "He's doing okay. I don't want to fix something that's not broken." When asked how she knew Carter would

not "do okay with his dad on equal-shared visitation," Stacy responded, "Because I'm not willing to take that chance." When pressed, she added, "Not willing to put Carter's well-being at risk. He formed his habits. He formed his routine. He knows what he's willing to do. I'm not willing to put his well-being at risk. He is dealing with it." When Stacy was asked if she considered Carter's well-being when she had the 2-year relationship with a significant other, she replied, "I did." She answered affirmatively when asked if she was willing to take the risk at that time. She also considered Carter's best interests when entering into other relationships and was willing to take the risk at the time to do that. But she was not willing to take the risk to go to a shared parenting time schedule with Anthony because she was "[n]ot willing to put Carter's success at risk."

Stacy placed considerable emphasis on the differences in homework expectations between Anthony and her. Stacy said Carter has a "green homework hand-in folder," and she has found it "crumpled up in the bottom of his bag." And Carter's assignment book is not regularly signed on Wednesdays after Carter has returned from time with Anthony. Stacy acknowledged this has not affected Carter's grades. Anthony testified he helps Carter with homework. They read, do spelling words, and they work on math sheets. Anthony and his wife have a routine in the household for all the children with regard to homework. Anthony admitted that "[t]here's always a chance for things to get overlooked," and it was possible Carter missed some homework assignments while with him.

Stacy also raised concerns about the inability to communicate with Anthony. She said her relationship with Anthony is "[n]ot good. There's no communication" and Stacy said the fault is "[b]oth of ours." She said communication is "very limited" and "things become very hostile very quickly," "especially since this has been going on," meaning the "court situation." But Stacy said that even when they were married, they did not communicate. When asked what she thought was the greatest cause of tension between them, Stacy answered, "Just both of us just need to communicate better." She felt family counseling would help. She also said Anthony being in uniform is a problem. She feels intimidated by Anthony when he is in uniform because "[h]e's made statements to me that no one would believe me." Stacy testified, "He's come to my house on duty before saying that no one would believe me. That he could go in to a courtroom and everyone would believe everything he would say. He has intentions of making everyone know how bad of a mom I am." She claimed Anthony said he can do whatever he wants "[b]ecause he's a cop." Anthony denied ever making such comments to Stacy, "Never in my life, ever."

Stacy claimed that in May 2016, Anthony drove his vehicle through her "planted grass" when he was dropping off Carter, so in response, she went to his house and parked one of her vehicle's tires on his lawn. Anthony denied purposefully driving over her grass. He claimed Stacy has a very thin driveway and when he was backing out, his "right front tire slipped off the edge of the driveway and got in the mud." Anthony said he "instantly apologized" and told Stacy if she had a rake, he would fix it with her. "She started ranting and raving, and Carter ran over." When Anthony got home, Stacy was texting and calling his phone, when "all of a sudden, my glass door on the front of my house was banged on so loudly I thought somebody was going to break the glass out of it." Stacy was standing at the front door with Carter at her side "ranting about his baseball shoes . . . that he left at my house." When Anthony looked outside, he saw that Stacy had parked her car on his grass. He called the police.

There was another point of contention that arose over possible guitar lessons for Carter. Anthony testified Stacy did not talk to him in advance about guitar lessons. Instead, he received a text message from her saying she was setting the lessons up, and that "they were going to be in Beatrice at 5:45 on Tuesdays." Tuesdays were Anthony's parenting nights. Anthony talked to Stacy and said the parenting plan provided that one parent does not plan activities on another parent's time without asking. "I wasn't happy. I just told her she is going to have to refigure it for another time, because I wasn't going to agree on that at that time."

A "very close friend" of Stacy's testified she visits Stacy's home a couple times a month, and Carter has been there about half the time. She described Stacy's home as organized and very comfortable. Stacy's father testified he sees Carter 2 to 3 times a week in the evenings and every other weekend when Stacy has him. He described the relationship between Stacy and Carter as "great," and "[t]hey are very close as parent and son." He described Stacy's home as "[v]ery clean, very neat, everything in place." He said Carter pays attention very well and is very polite. Stacy's father had no concerns about the relationship between Anthony and Carter based on his observations of them.

Even Stacy acknowledged Anthony is a good parent, and that he is a fit and proper parent for Carter. She had no problems with his parenting of Carter. Stacy testified Carter loves his dad and that Carter wants to be with his dad.

When Anthony was asked if Stacy was a fit parent, he answered, "Yes and no. I know she loves him deeply. I think she wants or tries to do what's best for him. But some of the decisions that she has made over and over in the past aren't in his best interests." As examples, he described Stacy "banging on my front door to where I made a police report, fighting in front of Carter, starting arguments in front of Carter, such as, the grass incident."

Regarding problems with Stacy, Anthony testified "[s]he is hard to get along with," and he tries his best to work with her, but "[e]verything has to be her way or you face threats or there's consequences." He said Stacy will withhold parenting time. Stacy will tell Anthony he can have Carter for a day, but then if Anthony makes her mad the next day, Stacy will say he is "not going to have him this week or this or that." For example, Anthony testified he had Carter for the Czech Days weekend, and Stacy was mad he was not willing to let her have Carter on that Sunday. Stacy told him if he did not let her have him on that Sunday, she would not let Anthony take Carter to Anthony's mother's funeral when she died (she was dying of cancer at the time). "[Stacy] told me I would not be taking [Carter] to [my mother's] funeral when she died if I did not give my son to her." Stacy said this was not true.

Anthony's older brother testified. Although he did not have a lot of contact with Stacy after the divorce, there were times when he was with Anthony and Carter "at my mom and dad's place," and "[t]he phone would just keep going on constantly and constantly." Anthony would answer and say he would talk later, "but the phone would keep ringing." The brother observed this happen on several occasions. Anthony's wife also talked about Stacy's telephone calls. She said there were times Stacy was calling "dozens of times per day, call after call, between [Anthony's] phone and the home phone, calling one after the other and then leaving messages on our answering machine." On one occasion, Stacy left a message "that upset the three older kids . . . [t]hey were crying and upset about it."

Anthony's wife testified that Anthony is "a great example for Carter" by "being so involved in Carter's life, and she and Anthony are both teaching Carter about "how to have a loving and mutually respectful relationship . . . that's something you can show a child."

Anthony's father described his involvement in activities with Carter, such as fishing, hunting, and ball games. He also discussed Stacy texting Anthony "constantly." Regarding the texts, he observed "there was a lot of filthy language in them." We note that the texts received as exhibits reflect inappropriate and disrespectful language used by both parties.

Anthony claimed he and Stacy were both fit and proper persons to parent Carter. He stated that although he had pled for sole physical custody, he "would be content with joint custody."

At the close of trial, the district court stated from the bench:

> I heard some evidence that Carter is a well[-]adjusted responsible, respectful young man, an intelligent young man. He knows why you two are fighting. Eventually, he is going to or there's the chance that he will come to the conclusion that it is his fault. It is not his fault.
>
> It is incumbent upon the both of you to act in a fashion that does not promote that conclusion being drawn by your son. You two may not get along. You did at one point. You had a child. He is a good kid, surprisingly well-adjusted good kid despite the way his parents get along.
>
> Please, do everything in your power to continue that. I don't want Carter affected by this any more than he already has. Okay? So I'm going to ask you between now and the issuing of my Order that you reflect on that and consider, you know, the damage that could be done to Carter by the continuation of your inability to communicate. Okay? That's all I ask.

It is clear the district court had genuine concerns about the parties' ongoing conflict and the potential impact, over time, on Carter. And when deciding custody issues, the court's paramount concern is the child's best interests. See *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). In its March 10, 2017, modification order, the district court found there had been a material change in circumstances since the entry of the decree affecting Carter's best interests "in that communication between the parties has broken down and they are unable to jointly agree upon parenting time as contemplated in the Decree." However, the court found the evidence was not sufficient to warrant a change in physical custody. We agree.

When the parties initially divorced, they agreed to joint legal and physical custody and settled upon a parenting schedule which afforded Stacy slightly over, and Anthony slightly under, one-half of Carter's time. The schedule was designed to accommodate Anthony's work schedule which required him to work weekends. When Anthony's work schedule changed sometime after October 2013, he attempted to negotiate a new parenting schedule which would provide for weekend parenting time with Carter. His proposals for equal parenting time were met with resistance from Stacy, and ultimately, he agreed to the every Tuesday and alternating weekend schedule proposed by Stacy. Based upon that parenting schedule being followed since February 2014, Stacy sought to modify their joint legal and physical custody status to her having sole physical custody.

However, as the district court concluded, the evidence did not support changing the physical custody arrangement; rather, the evidence revealed there was disagreement between the parties in how to reallocate parenting time as a result of Anthony's new work schedule. Although Anthony acquiesced to Stacy's proposed schedule in February 2014 so that he could start exercising weekend parenting time, he did not give up the right to seek more equal parenting time when Stacy brought the matter back into the courtroom. It was Stacy's burden to show it was in Carter's best interests to change physical custody. Her concerns about making sure Carter was getting his homework done and the ongoing difficulty in communication with Anthony are reasonable concerns. Additionally, it is fair for her to question changing the "status quo" when Carter was doing so well under the parenting schedule the parties had been using since February 2014. However, there is no evidence to indicate it was against Carter's best interests to spend equal amounts of time with each parent and to remain under a joint physical custody arrangement. It is clear both parents love Carter and that he thrives in each parent's care. Accordingly, given the record in this case, and given our standard of review and deference to the trial court's determinations with respect to the credibility of the witnesses, we cannot say the court's decision to not modify physical custody was clearly untenable or an abuse of discretion.

*Modification of Parenting Time Schedule.*

Stacy asserts the district court erred by modifying the parenting plan to an alternating weekly schedule.

The best interests of the children are the primary and paramount considerations in determining and modifying parenting time. *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016). The right of parenting time is subject to continuous review by the court, and a party may seek modification of a parenting time order on the grounds that there has been a material change in circumstances. *Id.*

In the argument section of her brief for this assigned error, rather than challenging the alternating weekly parenting schedule specifically, Stacy instead appears to focus more on there being a material change in circumstances resulting from the February 2014 change in the parenting schedule. She contends the schedule she and Anthony agreed to at that time was in effect for "more than 1,100 days," and Anthony "clearly took absolutely no affirmative actions to make changes to or otherwise dispute the 'new' schedule." Brief for appellant at 8-9. She goes on to argue that "[w]hile it is foreseeable that parents will slightly and occasionally deviate from an established parenting time schedule to accommodate employment schedules and the like, it is not foreseeable that parents would deviate as drastically and consistently as in this case." *Id.* at 9. She says, "The parties essentially went from an 8-6 schedule to a 10-4 schedule which was followed for just under three (3) years by the time of trial." *Id.* Stacy asserts, "It is abundantly clear that a material change in circumstances has occurred in this case in that the parties have been following a parenting time schedule which is drastically different than that set forth in the Decree." *Id.*

The district court did in fact conclude there had been a material change in circumstances warranting modification of the decree. However, in weighing Carter's best interests, the court concluded the evidence did not justify changing the parties' joint legal and physical custody arrangement. Rather, the court concluded Carter's best interests warranted modifying the parenting time schedule. But, rather than leaving in place the February 2014 schedule, which was Stacy's

preference, the court ordered the parties to exercise parenting time on an alternating weekly basis. Based on the communication issues between the parties evident in the record, ordering a parenting plan which would reduce the number of times the parties would have to have contact with each other (once per week), rather than the multiple contacts under the previous schedule, this decision was certainly not an abuse of discretion. See *State on behalf of Maddox S. v. Matthew E., supra*, (modified parenting plan to minimize opportunities for ongoing conflict not abuse of discretion).

Further, there is nothing in the record to suggest the equal parenting time Carter can enjoy with his parents under the court's modification order would be anything but in his best interests. Anthony testified Carter "loves to do stuff outdoors." Anthony said he takes Carter duck, goose, and deer hunting; Carter "loves to do things outdoors with me." They go to Anthony's in-laws' cabin, which is about 12 or 13 miles from Wilbur, where they have a trampoline and they go swimming, fishing, and for walks and bike rides. They have campfires, play catch and football, and the kids have sleepovers with friends. Also, Anthony is an assistant coach for Carter's baseball and football teams.

Anthony's wife testified she is typically home on weekdays by "around 4:00 o'clock, and then the first thing that we have the kids do when they get home is do their homework." She said Anthony "has just been a great dad." Anthony's wife said a lot of family live "in the area," so they are typically visiting family or vice versa on weekends. Also, "a ton of kids" live in their neighborhood, including "two of Carter's best friends" who live within a block of their house.

Although Stacy's desire to maintain the "status quo" is understandable, the record reveals that both parents love Carter and have a good relationship with him, and further, both are capable of providing a healthy, positive environment for him. The district court did not abuse its discretion in ordering an alternating weekly parenting schedule.

*Child Support.*

Stacy says the district court erred by ordering her to pay child support in accordance with Anthony's proposed parenting plan. She states she has consistently paid her court-ordered child support since the entry of the divorce decree, "even though Carter has been with her on a full-time basis for over three (3) years at this point." Brief for appellant at 14. She asserts that Anthony "has not contributed to Carter's support despite the existing parenting time arrangement." *Id*. She suggests Anthony should be ordered to pay $514 in child support, presumably based on the parenting schedule they had been exercising prior to the recent modification order. Stacy states, "Because the parenting plan was erroneously modified, the Court should have ordered [Anthony] to pay child support to Stacy in accordance with worksheet 1." *Id*. at 15. Stacy does not challenge the income or deductions used by the district court in determining child support; rather, her argument appears to be based entirely on the parties exercising the parenting schedule being used prior to the district court's modification order. Since we have not reversed the district court's order with regard to the modified parenting time schedule, we need not address this further. Accordingly, in light of the court modifying the parenting time schedule to an alternating weekly schedule, the court did not abuse its discretion in using Anthony's joint custody child support worksheet.

CONCLUSION

The district court's March 10, 2017, modification order is affirmed.

AFFIRMED.